NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ARACAJU, INC., an Arizona corporation, and NATHAN W. GWILLIAM and CRYSTAL GWILLIAM, husband and wife, *Plaintiffs/Appellees,*

*v.*

TRUE NORTH, INC., an Arizona corporation; and DALE R. GWILLIAM and KRISTIE GWILLIAM, husband and wife, *Defendants/Appellants.*

No. 1 CA-CV 13-0566

FILED 1-15-2015

Appeal from the Superior Court in Maricopa County
No. CV2007-022770
The Honorable Mark F. Aceto, Judge

**APPEAL DISMISSED**

COUNSEL

Udall Shumway PLC, Mesa
By David R. Schwartz
*Counsel for Plaintiffs/Appellees*

Jackson White PC, Mesa
By Bradley D. Weech, Roger R. Foote
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Margaret H. Downie and Judge Andrew W. Gould joined.

---

**T H U M M A**, Judge:

¶1 Appellants Dale and Kristie Gwilliam and True North, Inc. appeal from a judgment that facilitated the transfer of their ownership interests in several closely held companies to Appellees Nathan and Crystal Gwilliam and Aracaju, Inc., in exchange for $1,320,000. Because Dale voluntarily moved to obtain, and actually obtained, the $1,320,000 after the entry of judgment more than a year ago, he accepted the benefit of the judgment and therefore waived his right to challenge the judgment on appeal. Accordingly, this appeal is dismissed.

**FACTS AND PROCEDURAL HISTORY[1]**

¶2 Dale Gwilliam is Nathan Gwilliam's father. Nathan formed Aracaju, Inc., and Dale formed True North, Inc., to hold and manage certain assets related to seven adoption-related entities (the Companies). In this form, Nathan and Dale each were 50 percent owners of the Companies.

¶3 In December 2007, Nathan filed a petition seeking involuntary judicial dissolution of the Companies, alleging that he and Dale were "irreconcilably deadlocked in the management of the Companies." Pursuant to a stipulation, the superior court appointed a receiver to operate, manage and control the assets of the Companies. After subsequent motion practice, the superior court found that there were valid, enforceable operating agreements for two of the Companies that required a non-judicial buy/sell process (rather than judicial dissolution). The parties agreed that the buy/sell process of those agreements would apply to all of the Companies. Given the nature of the dispute, the parties actively involved the superior court in supervising the buy/sell process.

---

[1] The facts and procedural history of this case are complicated and include more than 600 docket entries in superior court, two prior appeals and several special actions. Those facts and history are well known to the parties and will not be repeated in detail here.

**¶4**          The superior court determined that Nathan was required to make buy/sell offers for the Companies. Nathan submitted offers that required Dale to either elect to sell his interest in, or to buy Nathan's interest in, the Companies within a specified time. Dale delivered timely elections that he wanted to be the buyer, but the transaction did not close in a timely fashion. As a result, at Nathan's request and over Dale's objection, the superior court issued an unsigned May 23, 2013 order rescinding Dale's elections and finding Nathan was the buyer under the financial terms of Dale's now-rescinded offers.

**¶5**          On July 19, 2013, the superior court issued a signed order that, as amended, allowed (1) Dale to deliver to the Clerk of Court various documents, including signed bills of sale and assignments for all of Dale's interest in the Companies, by dates certain, and (2) Nathan to deliver $1,320,000 to the Clerk of Court by a subsequent date certain. This July order provided that the court "shall release unto" Nathan the bills of sale and assignments upon Nathan's timely delivery of the $1,320,000. Although not expressed in the July order, after the release of the signed bills of sale and assignments to Nathan, Dale could request the release of the $1,320,000 and could obtain the release of that amount for his benefit upon further court order. In substance, the July order had the Clerk of Court holding property in escrow to be released pursuant to the July order or further order of the court.

**¶6**          Dale then filed an appeal that was dismissed for lack of an appealable judgment. After superior court certification pursuant to Arizona Rule of Civil Procedure 54(b) (2015),[2] Dale filed this appeal on September 16, 2013.

**¶7**          Starting in July 2013, Dale filed many motions effectively seeking to stay the enforcement of the May and July orders, filed several special actions seeking such relief with this court and filed numerous related procedural motions in superior court and this court. In doing so, Dale acknowledged that Nathan had "openly stated" an "inten[t] to sell the assets" of the Companies "to third parties" upon the release of the bills of sale and assignments. The superior court granted a temporary stay of enforcement that expired at 9:00 a.m. on September 26, 2013. The superior court allowed Dale the opportunity to continue the stay upon posting a $300,000 supersedeas bond. At no time did Dale post a supersedeas bond and at no time did he successfully obtain a reduced bond amount. *See* Ariz.

---

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

Rev. Stat. (A.R.S.) § 12-2108 (2013); Ariz. R. Civ. App. P. 7(a) (2013). Accordingly, as of 9:00 a.m. on September 26, 2013, the May and July orders were fully enforceable. *Compare* Ariz. R. Civ. App. P. 7(b) (2013) (discussing stay when supersedeas bond is filed).

**¶8**　　　　Before September 26, 2013, Dale timely deposited with the Clerk of Court the various documents, including bills of sale and assignments, directed by the July order. After 9:00 a.m. on September 26, 2013, Nathan deposited with the Clerk of Court $1,320,000 and received the various documents Dale had deposited, including bills of sale and assignments.[3]

**¶9**　　　　Still later on September 26, 2013, Dale filed an expedited motion seeking an order releasing the $1,320,000 to Dale through counsel, stating the request was "made without waiver of any rights and/or disagreement with the Court's rulings in this matter." After accounting for apparent liens and other issues, on November 8, 2013, the superior court granted Dale's motion for an order releasing the funds, which were then released as ordered on November 15, 2013.

**¶10**　　　　This court has jurisdiction over Dale's timely appeal challenging the May and July orders pursuant to A.R.S. §§ 12-120.21(A)(1) and -2101(A)(6).

### DISCUSSION

**I.**　　**Dale Waived His Right To Appeal Under The Acceptance Of The Benefit Doctrine.**

**¶11**　　　　Nathan argues this appeal should be dismissed under the acceptance of the benefit doctrine because Dale moved for and received the $1,320,000 in exchange for the transfer of ownership of the Companies. Under the acceptance of the benefit doctrine, "one who accepts the benefits of a judgment or ruling cannot thereafter attack it by appeal." *Ariz. Downs v. Superior Court*, 128 Ariz. 73, 74, 623 P.2d 1229, 1230 (1981) (citing cases). Stated differently, "'[a] party who accepts an award or legal advantage under an order, judgment or decree'" gives up the right "'to any [appellate] review of the adjudication as may again put in issue his right to the benefit which he has accepted.'" *Dowling v. Stapley*, 221 Ariz. 251, 265 ¶ 42, 211 P.3d 1235, 1249 (App. 2009) (quoting *Rosen v. Rae*, 132 Ariz. 509, 511, 647 P.2d

---

[3] Nathan later sold substantially all of the assets of the Companies to a third party.

640, 642 (App. 1982)). The doctrine is a type of quasi-estoppel by conduct, whereby the party's intent is not relevant. *See Rosen*, 132 Ariz. at 511–12, 647 P.2d at 642–43.

**¶12**      As applied, the July order allowed Dale to deliver to the Clerk of Court various documents, including signed bills of sale and assignments, for all of Dale's interest in the Companies. Dale then did so. Although he had a right to stay the requirements of the order by posting a $300,000 supersedeas bond, he never posted such a bond or successfully obtained an order allowing a lower bond amount. Critically for the application of the acceptance of the benefit doctrine, Dale then sought and *obtained* a court order releasing the $1,320,000 Nathan had deposited. This conduct squarely implicates the acceptance of the benefit doctrine, estopping Dale from pressing this appeal. *See id.* at 511–12, 647 P.2d at 642–43; *Busseuil v. Ariz. Veteran's Serv. Comm'n*, 17 Ariz. App. 379, 380, 498 P.2d 191, 192 (App. 1972).

**¶13**      Dale concedes that "Arizona does recognize the doctrine of acceptance of benefits to dismiss a case on an appeal." Dale argues, however, that there are exceptions to the application of the doctrine and asserts his appeal is not barred for, essentially, four reasons.

**¶14**      First, Dale argues the doctrine does not apply because he requested and obtained the release of the $1,320,000 after, not before, the appeal. The acceptance of the benefit doctrine, however, provides that a party who accepts the benefit of a judgment gives up the right to appellate review, regardless of whether the benefit was accepted before or after the filing of a notice of appeal. *See Dowling*, 221 Ariz. at 265 ¶ 42, 211 P.3d at 1249 (quoting *Rosen*, 132 Ariz. at 511, 647 P.2d at 642). Dale cites no Arizona authority holding the doctrine does not apply where the benefit is accepted after, rather than before, a notice of appeal is filed. Indeed, *Rosen* applied the doctrine based solely on conduct that "occurred after the filing of [the] appeal." 132 Ariz. at 511, 647 P.2d at 642. Accordingly, the fact that Dale sought and obtained the benefit after he filed his notice of appeal does not make the acceptance of the benefit doctrine inapplicable.

**¶15**      Second, Dale argues the doctrine does not apply because there was no detrimental reliance by Nathan. Dale, however, cites no Arizona authority holding the doctrine requires detrimental reliance. In fact, the doctrine is a form of quasi estoppel that does not require reliance by Nathan. *See Sailes v. Jones*, 17 Ariz. App. 593, 597 & n.1, 499 P.2d 721, 725 & n.1 (App. 1972) ("The doctrine of [q]uasi estoppel is based on . . . acceptance of benefits;" "In [q]uasi estoppel reliance by the party invoking the principle is not required.") (footnote omitted; citing cases). Any alleged lack

of detrimental reliance therefore does not bar the application of the acceptance of the benefit doctrine.

¶16         Third, Dale appears to argue the doctrine does not apply because his acceptance of the benefit was not voluntary but, instead, was under "circumstances of strong compulsion and financial duress," as noted in *Arizona Downs*, 128 Ariz. at 74, 623 P.2d at 1230. Here, however, there can be no claim that Dale made an "involuntary payment of a judgment" of the type that concerned the court in *Arizona Downs*. *Id.* At oral argument, Dale alleged that existing liens created circumstances of strong compulsion and financial duress that made the acceptance of the $1,320,000 involuntary. However, the record indicates that the lien amounts did not exceed $1,320,000 and yet Dale still sought the release of that full amount.[4] The acceptance of the benefit doctrine is implicated by Dale's requesting and receiving the full $1,320,000 *and* then challenging on appeal the order that allowed him to do so. Similarly, Dale moved for and received the money voluntarily, not to avoid waiving a legal right. *See Johnson v. Mofford*, 181 Ariz. 301, 303, 890 P.2d 76, 78 (App. 1995) (finding doctrine inapplicable where appellant, who challenged his removal from an executive board, participated in post-termination hearing "because he would lose all opportunity to have his removal from the Board examined by a court if he did not do so"). In short, Dale's conduct that implicates the doctrine here was voluntary; Dale made no timely, factually-supported duress claim and the record before this court would not support such a claim.

¶17         Fourth, relatedly, Dale cites *Del Rio Land, Inc. v. Haumont*, 110 Ariz. 7, 514 P.2d 1003 (1973), for the proposition that his actions were not voluntary and therefore his appeal should be allowed. Dale's reliance on *Del Rio*, however, is misplaced. *Del Rio* held that compliance with a court order, rather than risking a contempt citation, does not preclude appellate review. *See* 110 Ariz. at 10, 514 P.2d at 1006. The situation here, however, is quite different. Dale had the chance to prevent the transfer of ownership by

---

[4] After satisfying claims totaling nearly $16,500 by the Internal Revenue Service and another law firm, on November 13, 2013, the superior court released the remaining $1,305,000 to the trust account for the law firm representing Dale for Dale's benefit. That firm had filed an $862,233.03 lien for work performed through August 1, 2013. The record, however, does not show that Dale incurred additional legal fees from August 1, 2013 to November 13, 2013 exceeding the $442,726 difference between that lien amount as of August 1, 2013 and the $1,305,000 released on November 13, 2013.

posting a supersedeas bond, which he failed to do.[5] Moreover, Dale was not required by a court order to request that the funds be disbursed to avoid contempt. Nor was he forced to comply with an order from which no appeal was available or face a possible contempt citation, as was the case in *Del Rio*. *Id.*

¶18      In contrast to *Del Rio*, this case is analogous to *Busseuil*, where settlement funds from a wrongful death suit were deposited with the court and, on motion, apportioned and distributed to the statutory beneficiaries. 17 Ariz. App. at 379, 498 P.2d at 191. Appellant then sought to challenge the distribution on appeal, notwithstanding the acceptance of those benefits. *Id.* at 379–80, 498 P.2d at 191–92. This court dismissed that attempted appeal, noting appellant had accepted a distribution under the very order he sought to challenge on appeal. *Id.* Under *Busseuil*, because Dale moved for and obtained the release of the $1,320,000, Dale cannot now challenge the orders that allowed him to obtain that benefit. *See id.*

¶19      Although Dale notes that his motion for the distribution of funds stated it "[was] made without waiver of any rights and/or disagreement with the Court's rulings in this matter," his conduct in seeking and accepting the $1,320,000 constitutes an estoppel. *See Rosen*, 132 Ariz. at 511–12, 647 P.2d at 642–43 (noting party's intent is not relevant in applying the doctrine). Indeed, Nathan responded to Dale's motion for the distribution of funds by stating that Dale "proceed[s] at [his] own risk by asking for and accepting any distribution of the deposited funds." Moreover, the stipulation for the release of the funds and the resulting order did not preserve Dale's right to press this appeal. Dale's attempts by word to preserve his rights when successfully requesting by deed the release of the $1,320,000 does not preclude application of the acceptance of the benefit doctrine here.

¶20      The remedy Dale seeks on appeal further confirms that the doctrine applies here. The only remedy Dale seeks is that this court "order the sale undone," which runs squarely counter to his actions. Moreover, *Hackin v. Superior Court*, 102 Ariz. 93, 425 P.2d 420 (1967), the case Dale cites for his requested remedy, does not alter the conclusion. In *Hackin*, the

---

[5] The record does not show the $300,000 supersedeas bond amount was unreasonable. Although stating at oral argument before this court that he did not post the bond and obtained disbursal of the $1,320,000 because he was impecunious, the record does not suggest Dale moved to have the bond lowered to 50 percent of his net worth as was permissible under the applicable rules in place at the time. Ariz. R. Civ. App. P. 7(a)(2)(B) (2013).

superior court erroneously denied a stay and, in doing so, "effectively rendered nugatory the very purpose of a supersedeas bond." *Id.* at 94, 425 P.2d at 421. Here, by contrast, the court granted a temporary stay and then set a supersedeas bond, which Dale failed to post.

**¶21** Dale voluntarily and successfully moved to have the $1,320,000 disbursed and accepted the benefit of the superior court's orders. This conduct squarely implicates the acceptance of the benefit doctrine and, under that doctrine, Dale waived his right to appeal. Accordingly, and applying that doctrine, the appeal is dismissed.

## II. Attorneys' Fees And Costs On Appeal.

**¶22** Both parties request attorneys' fees on appeal pursuant to A.R.S. § 12-341.01 and taxable costs on appeal. Because Dale was not the prevailing party, his request is denied. This court, in its discretion, denies Nathan's request for attorneys' fees. Nathan is, however, awarded taxable costs on appeal, upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

**¶23** The appeal is dismissed.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama